Case 3:18-cv-00027-HES-MCR   Document 2   Filed 01/04/18   Page 1 of 45 PageID 145

IN THE CIRCUIT COURT, FOURTH
JUDICIAL CIRCUIT, IN AND FOR
DUVAL COUNTY, FLORIDA

CASE NO.:  16-2016-CA-007987-XXXX-MA
DIVISION:   CV-D

**COLLEEN HUCK,** and
**ETHAN G. HUCK, her husband**

     Plaintiffs,

v.

**LOREN Z. CLAYMAN, M.D.,**
**LOREN Z. CLAYMAN, M.D., P.A.,**
**a Florida corporation,**
**ALLERGAN, INC.,**
**a foreign corporation,**
**ALLERGAN SALES, LLC,**
**a foreign limited liability company,** and
**ALLERGAN USA, INC.,**
**a foreign corporation,**

     Defendants.

_____/

## **COMPLAINT**

The Plaintiffs, **COLLEEN HUCK** and **ETHAN G. HUCK, her husband**, sue the

Defendants, **LOREN Z. CLAYMAN, M.D., LOREN Z. CLAYMAN, M.D., P.A., a Florida**

**corporation, ALLERGAN, INC., a foreign corporation, ALLERGAN SALES, LLC, a**

**foreign limited liability company,** and **ALLERGAN USA, INC., a foreign corporation**, and

allege the following:

### **GENERAL ALLEGATIONS**

1.     This is an action for damages in excess of $15,000, exclusive of attorney's fees,

costs, and interest.

ACCEPTED: DUVAL COUNTY, RONNIE FUSSELL, CLERK, 05/31/2017 10:02:27 AM

2.    All conditions precedent to the filing of this action have been performed or have occurred.

3.    At all times material hereto, the Plaintiffs, **COLLEEN HUCK (**hereinafter "Ms. Huck") and **ETHAN G. HUCK** (hereinafter "Mr. Huck"), were and are residents of, and permanently domiciled in, the State of Georgia.

4.    At all times material hereto, the Defendant **LOREN Z. CLAYMAN, M.D.** (hereinafter "Loren Z. Clayman") was and is a resident of Jacksonville, Duval County, Florida.

5.    At all times material hereto, Loren Z. Clayman was and is a physician licensed to practice medicine by the State of Florida, who was and is practicing medicine in Duval County, Florida at his principal place of business located at 1801 Barrs Street, Suite 200, Jacksonville, Florida 32204 and/or 2 Shircliff Way, Suites 200-220, Jacksonville, Florida 32204.

6.    All medical care and treatment rendered to **COLLEEN HUCK** upon which the claims set forth herein are based took place in Jacksonville, Duval County, Florida.

7.    At all times material hereto, Loren Z. Clayman held himself out as a specialist in the area of plastic surgery.

8.    At all times material hereto, the Defendant **LOREN Z. CLAYMAN, M.D., P.A.** (hereinafter "Clayman PA") was and is a Florida corporation, with its principal place of business at 1801 Barrs Street, Suite 200, Jacksonville, Florida 32204 and/or 2 Shircliff Way, Suites 200-220, Jacksonville, Florida 32204.

9.    At all times material hereto, Loren Z. Clayman was and is an employee, agent or apparent agent of Clayman PA; at all times material hereto, Loren Z. Clayman was acting in the course and scope of his employment, agency or apparent agency with Clayman PA.

10.    The Defendant **ALLERGAN, INC.** is a foreign corporation existing and operating under the laws of the State of Delaware, with its principal place of business and permanent domicile at 2525 Dupont Drive, Irvine, California 92612.

11.    The Defendant **ALLERGAN, INC.** is authorized to do business in the State of Florida, and has and is doing business in the State of Florida, to-wit: researching, testing, designing, developing, manufacturing, marketing, promoting, distributing, selling, or otherwise placing into the stream of commerce medical devices and/or pharmaceuticals, including but not limited to, Allergan Natrelle saline filled breast implants and warranties for same, in Jacksonville, Duval County, Florida.

12.    The Defendant **ALLERGAN, INC.** may be reached for service of process in the State of Florida through its registered agent, CT Corporation System at 1201 Hays Street, Suite 105, Tallahassee, Florida 32301.

13.    The Defendant **ALLERGAN SALES, LLC** is a foreign limited liability company, with its principal place of business and permanent domicile at 2525 Dupont Drive, Irvine, California 92612.

14.    The Defendant **ALLERGAN SALES, LLC** is authorized to do business in the State of Florida, and has and is doing business in the State of Florida, to-wit: researching, testing, designing, developing, manufacturing, marketing, promoting, distributing, selling, or otherwise placing into the stream of commerce medical devices and/or pharmaceuticals, including but not limited to, Allergan Natrelle saline filled breast implants and warranties for same, in Jacksonville, Duval County, Florida.

15.    The Defendant **ALLERGAN SALES, LLC** may be reached for service of process in Florida through its registered agent, CT Corp. System, at 1200 South Pine Island

Road, Plantation, Florida 33324.

16.     The Defendant **ALLERGAN USA, INC.** is a foreign corporation existing and operating under the laws of the State of Delaware, with its principal place of business and permanent domicile at 2525 Dupont Drive, Irvine, California 92612.

17.     The Defendant **ALLERGAN USA, INC.** is authorized to do business in the State of Florida, and has and is doing business in the State of Florida, to-wit:  researching, testing, designing, developing, manufacturing, marketing, promoting, distributing, selling, or otherwise placing into the stream of commerce medical devices and/or pharmaceuticals, including but not limited to, Allergan Natrelle saline filled breast implants and warranties for same, in Jacksonville, Duval County, Florida.

18.     The Defendant **ALLERGAN USA, INC.** may be reached for service of process in Florida through its registered agent, CT Corp. System, at 1200 South Pine Island Road, Plantation, Florida 33324.

19.     The Defendants **ALLERGAN, INC., ALLERGAN SALES, LLC**, and **ALLERGAN USA, INC.** are hereinafter collectively referred to as "Allergan."

**PROCEDURAL ALLEGATIONS**

20.     Pursuant to an agreement executed by the attorney for Loren Z. Clayman and Clayman P.A. on February 22, 2017, and by the attorney for Mr. and Mrs. Huck on April 7, 2017, Mr. and Mrs. Huck have complied with all conditions precedent and pre-suit requirements for the filing of the instant lawsuit.

**FACTUAL ALLEGATIONS**

4

**Allergan's Natrelle Saline Filled Breast Implants**

21.    In 1962, two Texas plastic surgeons performed the first breast augmentation surgery using silicone gel filled implants.  In 1963, Dow Corning began manufacturing silicone gel filled breast implants based upon the Texas doctors' designs.

22.    Donald K. McGhan worked at the laboratory where Dow Corning first made breast implants.  In 1974 he founded McGhan Medical Corp., which began marketing silicone filled breast implants in 1975.

23.    In 1986 McGhan Medical Corp. merged with First America Corporation, changing its name to Inamed.  The new company's breast implants were still labeled McGhan breast implants.  By this time the company was one of the largest breast implant manufacturers in the world.

24.    As a result of emerging safety concerns, in 1988 the United States Food and Drug Administration (FDA) re-classified silicone gel filled breast implants as Class III medical devices, which then required breast implant manufacturers to submit Pre-Market Approval (PMA) applications to the FDA to prove by valid scientific data that their respective implants were safe and effective.

25.    After reviewing the PMA applications of the different silicone breast implant manufacturers (including those of Inamed/McGhan), in 1992 the FDA prohibited the sale of silicone breast implants.

26.    In 1994, a $4 billion class action lawsuit over silicone filled breast implants was settled.  Inamed contributed approximately $32,000,000 toward the settlement.

27.    In 1998, Inamed removed and replaced Donald K. McGhan from his position as

chairman and chief executive of the company.[1]

28.    On November 16, 1999, Inamed filed a PMA for the "McGhan Medical RTV Saline-Filled Breast Implant," later known as the "Natrelle Saline-Filled Breast Implant."  On May 10, 2000, the FDA issued a letter approving the PMA.

29.    In March of 2006, Inamed merged with Allergan, Inc., a company that makes products for eye care, neuroscience and dermatology, including its best known product, Botox, the injectable wrinkle treatment.  Afterward, McGhan Natrelle Saline Filled Breast Implants became known as "Allergan Natrelle Saline Filled Breast Implants."

30.    On November 17, 2006, the FDA approved PMA's from both Allergan and Mentor (Allergan's main U.S. competitor in the design and manufacture of breast implants) for new silicone filled breast implants.

31.    On February 20, 2013, the FDA approved Allergan, Inc.'s PMA for the Natrelle 410, anatomically shaped highly cohesive silicone gel-filled breast implants, a type of breast implants that are commonly referred to as "gummy bear" implants.  The new implants were softer, more cohesive, and more anatomically shaped than saline filled implants.

32.    In the last several years, silicone gel-filled implants have become the most commonly used types of breast implants in the U.S.

33.    With all Natrelle breast implants, Inamed/Allergan included its "ConfidencePlus Warranty."  According to the ConfidencePlus warranty literature provided by Allergan, the warranty program applied to all FDA-approved Natrelle breast implants, provided the implants were used:

---

[1]    McGhan is currently serving the remainder of a 10-year prison sentence in Texas for wire fraud in relation to a scheme in which he attempted to use real estate investors' money for another breast implant business.

- As intended by appropriately qualified and licensed surgeons, in accordance with current and accepted plastic surgery techniques
- In accordance with the current *Natrelle* Breast Implant Directions for Use, found at www.allergan.com/labeling/usa.htm.

However, the warranty only applied to cases of:

- Loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention
- Capsular contracture (Baker Grade III/IV) with *Natrelle* Gel implants that requires surgical intervention

34.    Under Allergan's *ConfidencePlus Warranty Matrix*, the Standard warranty comes with Natrelle implants free of additional cost, while the Premier warranty cost an additional $100 until 2014, and $200 thereafter; both warranties have terms of coverage of 10 years. The Standard warranty provides for a lifetime replacement of the ruptured implant, replacement of the contralateral implant (for 10 years)[2], and $1,200 for the cost of replacement/revision surgery. The Premier warranty provides for lifetime replacement of both the ruptured and contralateral implants, plus $2,400 for the cost of replacement/revision surgery.

**Clayman Defendants**

35.    Loren Z. Clayman was first licensed as a medical doctor in the State of Florida on January 10, 1975. On December 31, 1976, he completed a residency in plastic surgery, and he began practicing plastic surgery soon afterward in Jacksonville, Florida. On October 2, 1978, he filed articles of incorporation for Clayman PA, with himself listed as both President and the Registered Agent of the new corporation.

---

[2]    At first, only Natrelle Style 163 saline filled implants had lifetime replacement for contralateral breast implants; other Natrelle saline filled implants had only a 10 year warranty for contralateral implants. Beginning June 1, 2009, the Standard warranty was changed to provide for the lifetime replacement of contralateral breast implants for all Natrelle saline filled implants.

36.     Loren Z. Clayman began performing breast augmentation surgeries as part of his plastic surgery practice.  During the 1980's, a substantial portion of the breast augmentation procedures he performed were with silicone filled breast implants.

37.     After the FDA prohibited the sale of most silicone implants in 1992, Loren Z. Clayman began using saline filled implants almost exclusively.[3]

38.     By 2000, Loren Z. Clayman purchased at least a portion of the saline filled breast implants he used in augmentation procedures from Inamed/McGhan (later Allergan).  The majority (if not all) of saline filled breast implants he purchased from Inamed/McGhan were Natrelle saline filled breast implants.

39.     Before Ms. Huck first consulted with Loren Z. Clayman regarding breast augmentation in 2010, he began making a higher than average number of warranty claims for patients with saline filled implants.  In the vast majority of these claims, Loren Z. Clayman and/or Clayman PA alleged that one or more saline implants spontaneously ruptured/deflated through no fault of the patient or himself.  Furthermore, Loren Z. Clayman and/or Clayman PA began making multiple, successive warranty claims for many of his/their patients.  This practice of Loren Z. Clayman and/or Clayman PA continued during the course of treatment of Ms. Huck.

40.     Even after the FDA once again permitted the sale of silicone filled breast implants in 2006, Loren Z. Clayman and/or Clayman PA continued using saline filled breast implants almost exclusively for breast augmentation procedures.

41.     After June 30, 2008, Loren Z. Clayman's son, Mark Clayman, joined Clayman PA and began practicing plastic surgery, including performing breast augmentation procedures. For patients who received saline filled breast implants, Mark Clayman through Clayman PA also

---

[3]     Silicone filled breast implants could only be used for patients participating in ongoing medical studies, although it is unknown whether any of Loren Z. Clayman's patients participated in the studies.

began making a higher than average number of warranty claims in which he alleged spontaneous ruptures/deflations through no fault of the patient or him.  Likewise, in many instances, Mark Clayman through Clayman PA made multiple, successive warranty claims for patients, and he rarely, if ever, used silicone filled implants for breast augmentation procedures.

42.  **Between 2001 and 2015, Clayman PA made warranty claims to Allergan for more than 5,610 pairs of Natrelle saline filled breast implants.**

43.  According to Allergan's follow up studies for Natrelle saline filled implants, the rate of spontaneous deflations is approximately 2.7 to 6.8% at 5 years, and approximately 10 to 13.8% at 10 years, averaging roughly 1.2% per year.

44.  Pursuant to 21 C.F.R. §§ 814.80 and 814.82, Allergan has a continuing obligation to evaluate the "safety, effectiveness, and reliability" of medical devices such as Allergan Natrelle saline filled breast implants.  In accordance with these requirements, Allergan performs a "*Laboratory Analysis*" of each returned breast implant to determine the cause of an alleged rupture/deflation, after which a report is generated and maintained.  For the overwhelming majority of saline filled breast implants returned by Clayman PA to Allergan, Allergan found no identifiable causes for the claimed spontaneous ruptures/deflations.

45.  Nevertheless, to the best of the undersigned's knowledge and belief, Allergan paid every one of Clayman PA's warranty claims between 2001 and 2015.

**COLLEEN HUCK**

46.  Ms. Huck initially sought a consultation for breast augmentation from Loren Z. Clayman's office on or about February 2010 or March 2010.  Ms. Huck was concerned with her breasts being small.  Her specific goal was to increase the size from an A cup to a small C cup.

A surgery cost estimate form proposed to perform Augmentation Mammoplasty areola for $3,000, plus an operating room charge of $750.00.

47.    Loren Z. Clayman has no record of a discussion with her regarding her objectives, the possible alternatives, and counseling with regard to her condition.  There are no medical records to document any description of her current complaints, her desired goal, her family history, her past medical history, her past surgical history, or the medications she was taking. There is also no documented physical examination including dimensional assessment of Ms. Huck's breasts, nor is there a discussion of possible approaches, type or size of implants to be used, or how he intended to address her concerns.

48.    Ms. Huck returned to Loren Z. Clayman's office for surgery on or about March 2010.  There is no documented physical examination prior to the surgery, specifically no documented dimensional assessment of Ms. Huck's breasts nor any physical findings whatsoever. No preoperative photograph of Ms. Huck was maintained by Loren Z. Clayman or his staff.

49.    Ms. Huck underwent breast augmentation surgery by Dr. Loren Z. Clayman on or about March 2010.    Loren Z. Clayman recorded in the Operative Report, if one was ever prepared, that he entered the breasts through an incision in the areolas and the pectoralis muscle was entered in line with its fibers and the subpectoral pocket was then entered. The OR Record would have further indicated submuscular placement of the implants, had one been prepared.

50.    Loren Z. Clayman placed Allergan Natrelle saline implants bilaterally.   On information and belief, the patient was put under intravenous sedation with Versed and Ketamine administered by a registered nurse.

51.     After surgery, Ms. Huck noticed that her right implant had dropped significantly lower than her left.   Her breasts were asymmetric and felt rippled.   She also noticed that her breasts were hardening.

52.     Because of the above concerns Ms. Huck returned to Loren Z. Clayman's office again for follow up.   Loren Z. Clayman asked her whether she had lost weight to explain the appearance of the implants.   Loren Z. Clayman then told her that she had a right implant deflation and he would fix them.   Loren Z. Clayman told Ms. Huck that the surgery wouldn't cost anything except for her blood work and the warranty for the new implants.

53.     On or about August 2010 Ms. Huck underwent a second surgery by Loren Z. Clayman.     There is no documented physical examination prior to the surgery, specifically no documented dimensional assessment of Ms. Huck's breasts and no physical findings whatsoever. On information and belief, the Authorization for and Consent to Surgery states that Ms. Huck was undergoing a bilateral replacement as a result of a right deflation. There is no preoperative photograph that was maintained by Loren Z. Clayman or his staff.

54.     On information and belief the Operative Report, if one was prepared, gave a preoperative diagnosis of right deflation.   Loren Z. Clayman first entered the right breast and would have noted that the implant was found to have a partial deflation (tissue and leak in valve) and removed.  The OR Record, if one was prepared, would have made a similar statement.  The left implant would have been found intact but removed anyway.  Other Allergan Natrelle saline implants would have been inserted.  The patient would have been put under intravenous sedation by a registered nurse with Ketamine and Versed.

55.     On information and belief, Loren Z. Clayman made a warranty claim to Allergan for the right implant that he removed on or about August 2010.  In the paperwork he completed

and sent to Allergan, Loren Z. Clayman reported that there was a "[h]ole in valve" and/or "[p]articles in valve." On information and belief, after examining the returned right implant, Allergan documented in a *Laboratory Analysis* report that there were no findings to substantiate a spontaneous saline implant deflation. Despite this, Allergan paid Loren Z. Clayman and Clayman PA the sum of $1,200 or more for the surgery of August 2010.

56. After the second surgery Ms. Huck again experienced asymmetry and hardening of the breasts. In addition, the left breast now appeared smaller and dropped significantly lower than the right breast. Ms. Huck also experienced small amounts of blood and a white/yellow discharge from both nipples.

57. When Ms. Huck returned to see Loren Z. Clayman he again attempted to attribute the malpositioning of the breasts to weight loss. Loren Z. Clayman then claimed that the bleeding was from drinking energy drinks. He offered no other solution for her condition.

58. Shortly afterwards, the valve of Ms. Huck's left breast implant started to protrude through her left nipple so she returned again to Loren Z. Clayman's office. He again asked her if she had lost weight. Loren Z. Clayman claimed that she had sustained another spontaneous saline implant deflation, this time of the left implant. Loren Z. Clayman told her that he would do another bilateral replacement for free. A separate surgery cost estimate form would have been prepared indicating that a bilateral replacement would be performed at no charge due to a left deflation.

59. In May 2011 Colleen Huck returned for her third breast surgery by Loren Z. Clayman. There is no record that Loren Z. Clayman discussed the patient's goals or objectives prior to surgery. There is no indication that Loren Z. Clayman ever provided appropriate counseling regarding the size or structure of her breasts or their asymmetry. There is no

documented physical examination prior to the surgery of May 2011, specifically no documented dimensional assessment of Ms. Huck's breasts and no physical findings whatsoever.

60.    Loren Z. Clayman would have listed "Left deflation" as his preoperative diagnosis in the Operative Report and OR Record, if prepared.  Moreover, Loren Z. Clayman would have had the patient sign an Authorization for and Consent to Surgery on the day of surgery indicating that a bilateral replacement would be performed due to a left deflation.

61.    Loren Z. Clayman proceeded with Mr. Huck's third breast surgery in May 2011 by entering the left breast purportedly utilizing the previous areola incisions.  Loren Z. Clayman would have recorded that the left implant was found to have deflation (tissue @ valve) and removed and the OR Record would have made a similar statement.  Loren Z. Clayman replaced the left and right implants with other Allergan Natrell saline implants  (Allergan Style 68 High Profile 280 cc).  On information and belief, the patient was put under intravenous sedation by a registered nurse with Ketamine and Valium.

62.    Loren Z. Clayman made a warranty claim to Allergan for the left implant that he removed in May 2011.  In the paperwork he completed and sent to Allergan, Loren Z. Clayman reported that there was a "[h]ole in valve" and/or "[p]articles in valve."  On information and belief, after examining the returned left implant, Allergan documented in a *Laboratory Analysis* report that there were no findings to substantiate a spontaneous saline implant deflation. Despite this, Allergan paid Loren Z. Clayman and Clayman PA the sum of at least $1,200 for the surgery of May 2011.

63.    After the third surgery by Loren Z. Clayman, Ms. Huck's breasts were still extremely hard and malpositioned (both implants were positioned too high).   Blue stitching

protruded from her nipple areola complex. She was extremely sore, and the breasts themselves were misshapen. In addition, she sustained bilateral capsular contracture.

64.     As a result of her condition from Loren Z. Clayman, Ms. Huck sought a second opinion and had the implants removed on November 29, 2016. She has significant scarring and tissue damage as a direct result of Loren Z. Clayman's surgeries.

65.     During one or more of her visits to Clayman PA, Loren Z. Clayman examined the patient without a chaperone, made improper anatomical references, called her breasts "titties" or "tits," and "handled" her breasts with his body positioned behind and against hers while examining her as she faced a mirror. Loren Z. Clayman did not wear gloves during the examinations.

## COUNT I – CLAYMAN DEFENDANTS' MEDICAL NEGLIGENCE

66.     Ms. Huck re-alleges and incorporates by reference paragraphs 1 through 65.

67.     At all times material, Loren Z. Clayman owed Ms. Huck a duty to exercise that level of care, skill, and treatment which, in light of all relevant surrounding circumstances, was recognized as acceptable and appropriate by reasonably careful physicians caring for a patient such as Ms. Huck.

68.     On or between March 2010 and June 2011, Loren Z. Clayman and/or Clayman PA fell below the accepted and/or applicable standard of care in the treatment of Ms. Huck in one or more of the following ways:

      A.     Loren Z. Clayman failed to maintain a medical chart for Ms. Huck.

      B.     Loren Z. Clayman failed to appropriately discuss implant size with the patient. Patients should have the opportunity to try different size implants and have a

documented discussion regarding incision placement, tissue plane (pre/subpectoral), implant type, and implant size.

C.    It is the generally accepted standard of care to take basic measurements of breast dimensions to appropriately guide and help select the optimal implant size for a given patient's breast and chest size.  There is no documentation of any breast measurements that would have helped a prudent surgeon pick an appropriately sized implant for this patient based on commonly accepted dimensional planning concepts.  There is no documented discussion regarding implant volume or evidence that there was an attempt to size the patient appropriately prior to proceeding with surgery.

D.    Loren Z. Clayman failed to perform adequate and appropriate physical examinations or create assessments/plans.

E.    Loren Z. Clayman failed to correct the persistent malposition of the implants at some point during the course of care of Ms. Huck.   Throughout the course of care and treatment the malposition and asymmetry of the implants was the patient's primary concern.   However, Loren Z. Clayman never adequately addressed these concerns.    Rather than consider the patient's individual wishes and physical characteristics, Loren Z. Clayman choose to proceed with his universal, "one size fits all" approach:  placement of a high profile, overfilled saline implant through an areolar incision.  By failing to offer repositioning of the implants at some point during the course of her treatment, Loren Z. Clayman had little to no chance of meeting Ms. Huck's reasonable expectations of improving the appearance of her breasts and giving her the appearance she desired.

F.      Ms. Huck's current complaints and persistent deformities were set in motion by poor preoperative counseling and assessment, as well as poor intraoperative execution from the time of the first surgery.

G.      In addition to the failure to perform the procedures noted above, Loren Z. Clayman exacerbated the patient's malpositioning, asymmetry, and excessive hardness by placement of the overfilled, high profile implants.

H.      Silicone gel implants should have been offered or at least considered after the first and subsequent surgeries.  The benefits of switching to the silicone implants include a negligible risk of implant rupture and deflation, as well as a softer, less painful, and more natural feel without rippling compared to overfilled saline implants.

I.      Many of Ms. Huck's problems can be traced to grossly overfilling the saline implants placed by Loren Z. Clayman.  Overfilling saline implants frequently leads to excessive firmness or hardness of the entire breast and discomfort.  It can, and did in Ms. Huck's case, additionally lead to capsular contracture.  Numerous times Ms. Huck complained that her implants were, "rock hard" and uncomfortable which appear to be directly related to filling the implants beyond their recommended capacity.   Moreover, the sheer volume of augmentation used magnified the preexisting asymmetries of the breasts resulting in a worse appearance aesthetically.

J.      It is apparent that Loren Z. Clayman failed to measure and/or record the amount of saline used to inflate the implant(s) on each occasion.  Instead, Loren Z. Clayman merely estimated the amount of saline used.

K.      To the extent that the surgeries of August 2010 and May 2011 were indicated at all, they were indicated for the removal and replacement of only the implant suspected of deflation, not both implants.

L.      The type and quality of anesthesia provided to Ms. Huck to perform the initial purported subpectoral breast augmentation and subsequent revisions was inadequate and improper.   Loren Z. Clayman, M.D. used the sedation protocol of ketamine and versed, which was administered by a registered nurse.   This led to significant under-sedation.   Intravenous sedation should be deep enough to adequately perform the procedure without the patient being able to hear conversations, recall the procedure, or remember waking up during the surgery.   Moreover, the anesthetic regimen continued to be administered despite its insufficiency and the adverse complications experienced by the patient.

M.      It is very likely that the implants were difficult to position under the pectoralis major muscle due to inadequate muscle paralysis.   Subpectoral implants may be placed under intravenous sedation provided that a proper pectoralis block is performed to adequately relax the muscle in combination with rib blocks for optimal pain control.   There is no evidence that this was performed during any of Ms. Huck's surgeries, contributing further to her breast asymmetry and malpositioning.   The inadequate intravenous sedation during Ms. Huck's procedures more likely than not lead to an inadequate subpectoral plane and pocket development, and likely caused or contributed to the implants being malpositioned.

N.      General anesthesia should have been considered for the revisionary procedures because they were significantly more involved than her initial breast

augmentation procedure, and because of the history of inadequate sedation and adverse reactions suffered by the patient.  More likely than not, Loren Z. Clayman took into account the limitations of intravenous sedation when he performed the revision surgeries, and there was no legitimate medical justification for choosing intravenous sedation administered by a registered nurse for these procedures.  It appears that Loren Z. Clayman chose this approach merely to control costs and in this particular case, as another excuse to avoid performing a formal mastopexy.

O.      The removal and replacement of Ms. Huck's implants was, at a minimum, an extreme deviation from the standard of care.  It is unlikely that the patient experienced the number of spontaneous implant rupture/deflations reported by Loren Z. Clayman.  Allergan's implant follow-up studies show spontaneous saline implant deflation rates of only approximately 2.7 to 6.8% at 5 years, and approximately 10 to 13.8% at 10 years, averaging roughly 1.2% per year.  At that rate of deflation, the odds against a patient experiencing two (2) spontaneous deflations in just over a year that required replacement surgeries is high.  There was no evidence of implant failure upon examination of the explanted saline devices by Allergan.  A review of the medical literature failed to reveal any published studies or relevant clinical information regarding multiple spontaneous deflations in the same patient, which underscores how unlikely it would be for such a situation to occur.

P.      By repeatedly operating on this patient and claiming that her implants had deflated, Loren Z. Clayman placed her at an increased risk for surgical and anesthetic complications.  In addition it caused increased scarring and repeated capsular contracture.  These surgeries could have been avoided had Loren Z. Clayman used appropriately sized

implants, placed them in an appropriate position, and provided other appropriate care as outlined above in conjunction with the first operation.

Q.     Loren Z. Clayman concealed or intentionally misrepresented the cause of the patient's post-surgical results and subsequent complaints by claiming spontaneous deflations.

R.     By failing to act in a professional manner.  Loren Z. Clayman examined the patient without a chaperone, made improper anatomical references, called her breasts "titties" or "tits," and "handled" her breasts with his body positioned behind and against hers while examining her as she faced a mirror.  These actions are entirely unprofessional and a breach of the standard of care.

69.     As a direct and proximate result of above noted breach or breaches of the standard of care by Loren Z. Clayman and/or Clayman PA, Ms. Huck suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

70.     Furthermore, on one or more occasions Loren Z. Clayman and/or Clayman PA fraudulently concealed or intentionally misrepresented to Ms. Huck and/or others that a saline implant that had been implanted in her body spontaneously deflated or ruptured; such fraud, concealment, or intentional misrepresentation caused Ms. Huck to conclude that the problems she was having with her breasts were the result of product defects rather than the result of breaches of the applicable standard of care by Loren Z. Clayman and/or Clayman PA.

WHEREFORE, the Plaintiff **COLLEEN HUCK** demands judgment for damages against the Defendants, **LOREN Z. CLAYMAN, M.D.** and **LOREN Z. CLAYMAN, M.D., P.A.** together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

### COUNT II – CLAYMAN DEFENDANTS' BREACH OF FIDUCIARY DUTY

71.     Ms. Huck re-alleges and incorporates by reference paragraphs 1 through 65 and 68.

72.     On or between February 2010 and May or June 2011, Ms. Huck was a patient of Loren Z. Clayman.  By virtue of the physician-patient relationship, Loren Z. Clayman and Clayman PA had a fiduciary duty to Ms. Huck to not perform acts for his/their own pecuniary gain that were contrary to her welfare.

73.     Loren Z. Clayman and/or Clayman PA violated this fiduciary duty to Ms. Huck in one or more of the following ways:

(a).     By repeatedly claiming that her breast implants had deflated when in fact they had not.

(b).     By repeatedly operating on Ms. Huck, which placed her at an increased risk for surgical and anesthetic complications, yet simply repeating the same procedures that were previously performed.

(c).     By repeatedly not performing the surgery that her physical condition actually required, as described above, in favor of surgery that took less time and skill, to save Loren Z. Clayman and/or Clayman PA time and money.

(d).    By repeatedly operating on her when he knew or should have known that he did not have the skill or competency to perform the surgeries within the standard of care.

(e).    By repeatedly operating on her so that Loren Z. Clayman and/or Clayman PA could recover a surgical fee from Allergan each time.

(f).    By performing surgery with inadequate anesthesia because it was cheaper, which in turn led to improper implant placement as well as increased pain, discomfort, and anxiety.

74.    Furthermore, on one or more occasions Loren Z. Clayman and/or Clayman PA fraudulently concealed or intentionally misrepresented to Ms. Huck and/or others that a saline implant that had been implanted in her body had spontaneously deflated; such fraud, concealment, or intentional misrepresentation caused Ms. Huck to conclude that the problems she was having with her breasts were the result of product defects rather than the result of breaches of Loren Z. Clayman's fiduciary duties to her.

75.    As a direct and proximate result of Loren Z. Clayman's and/or Clayman PA's breaches of fiduciary duties to Ms. Huck, she suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

WHEREFORE, the Plaintiff **COLLEEN HUCK** demands judgment for damages against the Defendants, **LOREN Z. CLAYMAN, M.D.**, and **LOREN Z. CLAYMAN, M.D., P.A.**, together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all

issues so triable.

## COUNT III – CLAYMAN DEFENDANTS' VIOLATIONS OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

76.     Ms. Huck re-alleges and incorporates by reference paragraphs 1 through 65.

77.     On one or more occasions between February 2010 and June 2011, Loren Z. Clayman and/or Clayman PA, engaged in one or more of the following acts:

(a).     Caused or allowed to be printed, published, or otherwise disseminated to the general public advertisements soliciting patients for "Loren Z. Clayman's Plastic Surgery Center & Miracle Spa" when there is no organized entity or even a registered fictitious name for such an entity or organization.

(b).     Caused or allowed to be printed, published, or otherwise disseminated to the general public advertisements that represented that Loren Z. Clayman had the experience, competence and finesse to produce extraordinary surgical results, when in fact such representations were false.

(c).     Represented to Ms. Huck and/or others that a saline implant that had been implanted in her had spontaneously ruptured or deflated, when in fact it had not.

78.     The aforementioned acts of Loren Z. Clayman and/or Clayman PA were "[u]nfair methods of competition, unconscionable acts or practices, or unfair or deceptive practices" as contemplated by Section 501.204, *Florida Statutes*.

79.     Ms. Huck is a "consumer" and Loren Z. Clayman and/or Clayman PA were and are engaged in "trade or commerce," as both terms are defined in Section 501.203 (7) and (8), Florida Statutes.

80.     As a direct and proximate result of the aforesaid acts of Loren Z. Clayman and/or

Clayman PA, Ms. Huck suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

81.    Furthermore, as a direct and proximate result of the aforesaid acts of Loren Z. Clayman and/or Clayman PA, Ms. Huck spent monies in the amount of $3,750 or more, for medical and/or surgical care by Loren Z. Clayman and/or Clayman PA that was of no value, and which caused her to need future medical care and incur related expenses to correct the damages done by said past medical and/or surgical care of Loren Z. Clayman and/or Clayman PA.

82.    As a result of the aforesaid acts of Loren Z. Clayman and/or Clayman PA, Ms. Huck has retained or employed the undersigned law firm, and she has agreed to pay the firm a reasonable fee for its services in that regard.

WHEREFORE, the Plaintiff, **COLLEEN HUCK**, seeks the following relief:

(a).    Judgment for damages against the Defendants, **LOREN Z. CLAYMAN, M.D.,** and/or  **LOREN Z. CLAYMAN, M.D., P.A.**

(b).    The court costs of this action, and attorney's fees pursuant to Sections 501.2105 and 501.211(2), *Florida Statutes*.

(c).    A declaratory judgment that one or more acts or practices of one or more of the Defendants violated the *Florida Deceptive and Unfair Trade Practices Act*.

(d).    An order enjoining one or more of the Defendants from engaging in the above noted acts or practices.

(e).    The Plaintiff further demands a trial by jury on all issues so triable.

## COUNT IV – CLAYMAN DEFENDANTS' FRAUD

83.     Ms. Huck re-alleges and incorporates by reference paragraphs 1 through 65.

84.     On one or more of the below occasions, Loren Z. Clayman and/or Clayman PA made the following false statements or representations, which were intended to conceal his inability to perform the breast augmentation procedures competently and within the standard of care, and which in fact misled Ms. Huck and/or caused her to respond in the following ways to her detriment:

(a).     In July or August 2010, Loren Z. Clayman told Ms. Huck that her right breast implant was deflated and needed to be replaced.  In fact, Ms. Huck did not have a right implant deflation, rupture, or leak, and he did not have the intention or ability to correct the actual problems with her breasts.  These representations caused Ms. Huck to conclude that the problems she was experiencing with her breasts were not the result of Loren Z. Clayman's breach of the standard of care in his previous surgery, but that she had a defective breast implant; these representations also caused her to agree to have another surgery by Loren Z. Clayman instead of a different plastic surgeon.  As a result, Ms. Huck did not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

(b).     In a surgical estimate prepared in July or August 2010 Loren Z. Clayman represented to Ms. Huck that her right breast implant was deflated and needed to be replaced.  In fact, Ms. Huck did not have a right implant deflation, rupture, or leak, and he did not have the intention or ability to correct the problems with her breasts.  These representations caused Ms. Huck to conclude that the problems she was experiencing with her breasts were not the result of Loren Z. Clayman's breach of the standard of care

in his previous surgery, but that she had a defective breast implant; these representations also caused her to agree to have another surgery by Loren Z. Clayman instead of a different plastic surgeon.  As a result, Ms. Huck did not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

(c).    In the informed consent of August 2010 Loren Z. Clayman represented to Ms. Huck that her right breast implant was deflated and needed to be replaced. In fact, Ms. Huck did not have a deflation, rupture, or leak of her right implant, and Loren Z. Clayman did not have the intention or ability to correct the problems with her breasts. These representations caused Ms. Huck to conclude that the problems she was experiencing with her breasts were not the result of Loren Z. Clayman's breach of the standard of care in his previous surgery, but that she had a defective breast implant; these representations also caused her to agree to have another surgery by Loren Z. Clayman instead of a different plastic surgeon.  As a result, Ms. Huck did not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

(d).    In the Operative Report and OR Record of August 2010 Loren Z. Clayman represented to Ms. Huck that her right breast implant was deflated and needed to be replaced. In fact, Ms. Huck did not have a deflation, rupture, or leak of her right implant, and Loren Z. Clayman did not have the intention or ability to correct the problems with her breasts.  These representations caused Ms. Huck to conclude that the problems she was experiencing with her breasts were not the result of Loren Z. Clayman's breach of the standard of care in his previous surgery, but that she had a

defective breast implant; these representations also caused her to agree to have another surgery by Loren Z. Clayman instead of a different plastic surgeon. As a result, Ms. Huck did not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

(e).    After the August 2010 surgery, Loren Z. Clayman made a warranty claim to Allergan regarding the right implant removed in the August 2010 surgery indicating a defect of the implant. By having Ms. Huck sign this claim form Loren Z. Clayman represented to her that her right implant was leaking and/or defective and needed to be replaced. In fact, Ms. Huck did not have a deflation, rupture, or leak of her right implant, and Loren Z. Clayman did not have the intention or ability to correct the problems with her breasts. These representations caused Ms. Huck to conclude that the problems she was experiencing with her breasts were not the result of Loren Z. Clayman's breach of the standard of care in his previous surgery, but that she had defective breast implants; these representations also caused her to agree to have another surgery by Loren Z. Clayman instead of a different plastic surgeon. As a result, Ms. Huck did not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

(f).    In April or May 2011, Loren Z. Clayman told Ms. Huck that her left breast implant was deflated and needed to be replaced. In fact, Ms. Huck did not have a left implant deflation, rupture, or leak, and he did not have the intention or ability to correct the actual problems with her breasts. These representations caused Ms. Huck to conclude that the problems she was experiencing with her breasts were not the result of Loren Z. Clayman's breach of the standard of care in his previous surgery, but that she had a

defective breast implant; these representations also caused her to agree to have another surgery by Loren Z. Clayman instead of a different plastic surgeon.  As a result, Ms. Huck did not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

(g).    In a surgical estimate prepared in April or May 2011, Loren Z. Clayman represented to Ms. Huck that her left breast implant was defective and needed to be replaced.  In fact, Ms. Huck did not have a defective left implant, an implant deflation, rupture, or leak, and he did not have the intention or ability to correct the problems with her breasts.  These representations caused Ms. Huck to conclude that the problems she was experiencing with her breasts were not the result of Loren Z. Clayman's breach of the standard of care in his previous surgery, but that she had a defective breast implant; these representations also caused her to agree to have another surgery by Loren Z. Clayman instead of a different plastic surgeon.  As a result, Ms. Huck did not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

(h).    In the informed consent dated May 2011, Loren Z. Clayman represented to Ms. Huck that her left breast implant was defective and needed to be replaced. In fact, Ms. Huck did not have a defective implant, an implant deflation, rupture, or leak of her left implant, and Loren Z. Clayman did not have the intention or ability to correct the problems with her breasts.  These representations caused Ms. Huck to conclude that the problems she was experiencing with her breasts were not the result of Loren Z. Clayman's breach of the standard of care in his previous surgery, but that she had a defective breast implant; these representations also caused her to agree to have another

surgery by Loren Z. Clayman instead of a different plastic surgeon. As a result, Ms. Huck did not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

(i).    In the Operative Report and OR Record dated May 2011, Loren Z. Clayman represented to Ms. Huck that her left breast implant was deflated and needed to be replaced. In fact, Ms. Huck did not have a deflation, rupture, or leak of her left implant, and Loren Z. Clayman did not have the intention or ability to correct the problems with her breasts. These representations caused Ms. Huck to conclude that the problems she was experiencing with her breasts were not the result of Loren Z. Clayman's breach of the standard of care in his previous surgery, but that she had a defective breast implant; these representations also caused her to agree to have another surgery by Loren Z. Clayman instead of a different plastic surgeon. As a result, Ms. Huck did not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

(j).    After the May 2011 surgery, Loren Z. Clayman made a warranty claim to Allergan regarding the left implant removed in the May 2011 surgery indicating a defect of the implant. By having Ms. Huck sign this claim form Loren Z. Clayman represented to her that her left implant was leaking and/or defective and needed to be replaced. In fact, Ms. Huck did not have a deflation, rupture, or leak of her left implant, and Loren Z. Clayman did not have the intention or ability to correct the problems with her breasts. These representations caused Ms. Huck to conclude that the problems she was experiencing with her breasts were not the result of Loren Z. Clayman's breach of the standard of care in his previous surgery, but that she had defective breast implants; these

representations also caused her to agree to have another surgery by Loren Z. Clayman instead of a different plastic surgeon. As a result, Ms. Huck did not seek a second opinion from another plastic surgeon, nor did she seek legal counsel for a potential medical negligence claim.

(k).    In February or March 2010 and at each visit with his office thereafter, Loren Z. Clayman represented to Ms. Huck that he was a competent plastic surgeon who could perform breast augmentation revision and related procedures in a reasonably competent manner that was within the standard of care. This representation was false because he was not in fact reasonably competent to perform the requested procedures within the standard of care. This representation caused Ms. Huck to choose Loren Z. Clayman for breast surgery as opposed to other plastic surgeons.

(l).    In February or March 2010 and at each visit thereafter, Loren Z. Clayman represented that he knew the appearance that Ms. Huck wanted for her breasts, and that he could achieve that appearance through the planned surgery. In fact, whether Loren Z. Clayman knew what appearance she desired or not, he did not have the ability or intention to perform the procedures necessary to provide her with the desired appearance (i.e. addressing her complaints of sagging and asymmetry). This representation caused Ms. Huck to choose Loren Z. Clayman for breast surgery as opposed to other plastic surgeons who would have been able to provide her with the desired appearance.

85.    As a result of the above false statements or representations, Loren Z. Clayman, and/or Clayman PA were able to continue collecting money in relation to the medical and surgical care of Ms. Huck, Ms. Huck did not seek a second opinion from another plastic surgeon, and/or Ms. Huck delayed seeking legal counsel for potential medical negligence.

29

86.    As a direct and proximate result of the above noted false statements or representations of Loren Z. Clayman and/or employees or agents of Clayman PA, Ms. Huck suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

87.    Furthermore, as a direct and proximate result of the above noted false statements or representations by Loren Z. Clayman and/or employees or agents of Clayman PA, Ms. Huck spent monies in the amount of $3,750 or more for medical and/or surgical care by Loren Z. Clayman and/or Clayman PA that was of no value, and which has caused her to have to incur future medical expenses for medical and surgical care to correct the damage done by Loren Z. Clayman and/or Clayman PA.

WHEREFORE, the Plaintiff, **COLLEEN HUCK**, demands judgment for damages against the Defendants, **LOREN Z. CLAYMAN, M.D.** and **LOREN Z. CLAYMAN, M.D., P.A.** together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

### COUNT V – CLAYMAN DEFENDANTS AND ALLERGAN'S CONSPIRACY TO COMMIT FRAUD AND/OR BREACH OF FIDUCIARY DUTY

88.    Ms. Huck re-alleges and incorporates by reference paragraphs 1 through 65.

89.    On or before February or March 2010, Loren Z. Clayman and/or Clayman PA entered into an agreement with Allergan to commit fraud and/or breach of fiduciary duty.

90.    Ms. Huck re-alleges and incorporates by reference paragraphs 72 through 75 as the allegations of conduct by Loren Z. Clayman and/or Clayman PA in furtherance of the breach of the fiduciary duty owed by Loren Z. Clayman and/or Clayman PA to Ms. Huck.

91.    Ms. Huck re-alleges and incorporates by reference paragraphs 84 through 87 as the allegations of fraud upon Ms. Huck committed by Loren Z. Clayman and/or Clayman PA.

92.    Allergan committed one or more of the following overt acts in furtherance of the conspiracy to commit fraud and/or breach of fiduciary duty:

(a).    Paying the warranty claim of Loren Z. Clayman and/or Clayman PA, without requesting further corroboration, in relation to the right Natrelle saline filled breast implant that Loren Z. Clayman placed into Ms. Huck in March 2010, and which Loren Z. Clayman surgically removed in August 2010, despite the following:

(1).    Allergan's *Laboratory Analysis* report for the right saline filled breast implant that was implanted by Loren Z. Clayman into Ms. Huck in March 2010, and explanted from Ms. Huck by Loren Z. Clayman in August 2010 did not support a claim of "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention," and, thus, that the August 2010 surgery was not necessary as a result of a failed breast implant;

(2).    Loren Z. Clayman and/or Clayman PA had previously made hundreds of warranty claims to Allergan (McGhan) for saline filled breast implants for which Allergan's *Laboratory Analysis* reports did not support claims of "loss of shell integrity, resulting in implant rupture or deflation that required surgical intervention," and, thus, the explant surgeries were not necessary as result of failed breast implants; and

(3).    The rate of rupture/deflations of Natrelle saline filled implants claimed by Loren Z. Clayman and/or Clayman PA was markedly higher than the rate shown by Allergan's own follow up studies for Natrelle saline filled implants.

(b).    Paying the warranty claim of Loren Z. Clayman and/or Clayman PA, without requesting further corroboration, in relation to the left Natrelle saline

filled breast implant that Loren Z. Clayman placed into Ms. Huck in August 2010, and which Loren Z. Clayman surgically removed in May 2011, despite the following:

>    (1).    Allergan's *Laboratory Analysis* report for the right saline filled breast implant that was implanted by Loren Z. Clayman into Ms. Huck in March 2010, and explanted from Ms. Huck by Loren Z. Clayman in August 2010 did not support a claim of "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention," and, thus, that the August 2010 surgery was not necessary as a result of a failed breast implant;

>    (2).    Allergan's *Laboratory Analysis* report for the left saline filled breast implant that was implanted by Loren Z. Clayman into Ms. Huck in August 2010 and explanted from Ms. Huck by Loren Z. Clayman in May 2011 did not support a claim of "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention," and, thus, that the May 2011 surgery was not necessary as a result of a failed breast implant;

>    (3).    Loren Z. Clayman and/or Clayman PA had previously made hundreds of warranty claims to Allergan (McGhan) for saline filled breast implants for which Allergan's *Laboratory Analysis* reports did not support claims of "loss of shell integrity, resulting in implant rupture or deflation that required surgical intervention," and, thus, the explant surgeries were not necessary as result of failed breast implants; and

>    (4).    The rate of rupture/deflations of Natrelle saline filled implants claimed by Loren Z. Clayman and/or Clayman PA was markedly higher than the rate shown by Allergan's own follow up studies for Natrelle saline filled implants.

(c).    Continuing to sell saline filled breast implants to Loren Z. Clayman and/or Clayman PA after February 2010, despite the following:

>    (1).    Allergan's *Laboratory Analysis* report for the right saline filled breast implant that was implanted by Loren Z. Clayman into Ms. Huck in March 2010, and explanted from Ms. Huck by Loren Z. Clayman in August 2010 did not support a claim of "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention," and, thus, that the August 2010 surgery was not necessary as a result of a failed breast implant;

(2).    Allergan's *Laboratory Analysis* report for the left saline filled breast implant that was implanted by Loren Z. Clayman into Ms. Huck on August 2010 and explanted from Ms. Huck by Loren Z. Clayman in May 2011, did not support a claim of "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention," and, thus, that the May 2011 surgery was not necessary as a result of a failed breast implant;

(3).    Loren Z. Clayman and/or Clayman PA had previously made hundreds of warranty claims to Allergan (McGhan) for saline filled breast implants for which Allergan's *Laboratory Analysis* reports did not support claims of "loss of shell integrity, resulting in implant rupture or deflation that required surgical intervention," and, thus, the explant surgeries were not necessary as result of failed breast implants; and

(4).    The rate of rupture/deflations of Natrelle saline filled implants claimed by Loren Z. Clayman and/or Clayman PA was markedly higher than the rate shown by Allergan's own follow up studies for Natrelle saline filled implants.

(d).    Failing to report Loren Z. Clayman, and/or Clayman PA to the appropriate authorities after February 2010, despite the following:

(1).    Allergan's *Laboratory Analysis* report for the right saline filled breast implant that was implanted by Loren Z. Clayman into Ms. Huck in March 2010, and explanted from Ms. Huck by Loren Z. Clayman in August 2010, did not support a claim of "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention," and, thus, that the August 2010 surgery was not necessary as a result of a failed breast implant;

(2).    Allergan's *Laboratory Analysis* report for the left saline filled breast implant that was implanted by Loren Z. Clayman into Ms. Huck in August 2010 and explanted from Ms. Huck by Loren Z. Clayman in May 2011, did not support a claim of "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention," and, thus, that the May 2011 surgery was not necessary as a result of a failed breast implant;

(3).    Loren Z. Clayman and/or Clayman PA had previously made hundreds of warranty claims to Allergan (McGhan) for saline filled breast implants for which Allergan's *Laboratory Analysis* reports did not support claims of "loss of shell integrity, resulting in implant rupture or

33

deflation that required surgical intervention," and, thus, the explant surgeries were not necessary as result of failed breast implants; and

(4).    The rate of rupture/deflations of Natrelle saline filled implants claimed by Loren Z. Clayman and/or Clayman PA was markedly higher than the rate shown by Allergan's own follow up studies for Natrelle saline filled implants.

93.    As a direct and proximate result of the above noted conspiracy to commit fraud and/or breach of fiduciary duty by Loren Z. Clayman and/or Clayman PA, and also by Allergan, Ms. Colleen Huck suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

94.    Furthermore, as a direct and proximate result of the above noted conspiracy to commit fraud and/or breach of fiduciary duty by Loren Z. Clayman and/or Clayman PA, and also by Allergan, Ms. Huck has spent monies in the amount of $3,750 or more, for medical and/or surgical care by Loren Z. Clayman, and/or Clayman PA that was of no value, and which has caused her to have to incur future medical expenses in the future to correct the damages done by said medical and/or surgical care.

WHEREFORE, the Plaintiff **COLLEEN HUCK**, demands judgment for damages against the Defendants, **LOREN Z. CLAYMAN, M.D., LOREN Z. CLAYMAN, M.D., P.A., ALLERGAN, INC., ALLERGAN SALES, LLC,** and **ALLERGAN USA, INC.,** together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

## COUNT VI – ALLERGAN AIDING AND ABETTING FRAUD
## AND/OR BREACH OF FIDUCIARY DUTY

95.    Ms. Huck re-alleges and incorporates by reference paragraphs 1 through 65.

96.    Ms. Huck re-alleges and incorporates by reference paragraphs 72 through 75 as the allegations of conduct by Loren Z. Clayman, and/or Clayman PA in furtherance of the breach of the fiduciary duty owed by Loren Z. Clayman and/or Clayman PA to Ms. Huck.

97.    Ms. Huck re-alleges and incorporates by reference paragraphs 84 through 87 as the allegations of fraud upon Ms. Huck committed by Loren Z. Clayman and/or Clayman PA.

98.    Allergan, through its employees or agents, knew that Loren Z. Clayman and/or Clayman PA, was committing fraud upon Ms. Huck, and/or breaching a fiduciary duty owed to Ms. Huck, due to the following:

(a).    Allergan's *Laboratory Analysis* report for the right saline filled breast implant that was implanted by Loren Z. Clayman into Ms. Huck in March 2010, and explanted from Ms. Huck by Loren Z. Clayman in August 2010, did not support a claim of "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention," and, thus, that the August 2010 surgery was not necessary as a result of a failed breast implant;

(b).    Allergan's *Laboratory Analysis* report for the left saline filled breast implant that was implanted by Loren Z. Clayman into Ms. Huck in August 2010, and explanted from Ms. Huck by Loren Z. Clayman in May 2011, did not support a claim of "loss of shell integrity, resulting in implant rupture or deflation that requires surgical intervention," and, thus, that the May 2011 surgery was not necessary as a result of a failed breast implant;

(c).    Loren Z. Clayman and/or Clayman PA had previously made hundreds of warranty claims to Allergan (McGhan) for saline filled breast implants for which Allergan's *Laboratory Analysis* reports did not support claims of "loss of shell integrity, resulting in implant rupture or deflation that required surgical intervention," and, thus, the explant surgeries were not necessary as result of failed breast implants; and

(d).    The rate of rupture/deflations of Natrelle saline filled implants claimed by Loren Z. Clayman and/or Clayman PA was markedly higher than the rate shown by Allergan's own follow up studies for Natrelle saline filled implants.

99.    Despite the aforesaid knowledge of Allergan through its employees or agents, Allergan provided substantial assistance to Loren Z. Clayman and/or Clayman PA in committing fraud against Ms. Huck, and/or breaching a fiduciary duty owed to Ms. Huck, in either or both of the following ways:

(a).    Paying the warranty claim of Loren Z. Clayman and/or Clayman PA, without requesting further corroboration, in relation to the right Natrelle saline filled breast implant that Loren Z. Clayman placed into Ms. Huck in March 2010, and which Loren Z. Clayman surgically removed in August 2010.

(b).    Paying the warranty claim of Loren Z. Clayman and/or Clayman PA, without requesting further corroboration, in relation to the left Natrelle saline filled breast implant placed into Ms. Huck by Loren Z. Clayman in August 2010, and which Loren Z. Clayman surgically removed in May 2011;

(c).    Continuing to sell saline filled breast implants to Loren Z. Clayman, and/or Clayman PA after February 2010; and/or

(g).    Failing to report Loren Z. Clayman and/or Clayman PA to the appropriate authorities after February 2010.

100.    As a direct and proximate result of the substantial assistance provided by Allergan to Loren Z. Clayman and/or Clayman PA, Ms. Colleen Huck suffered bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical

and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

101.    Furthermore, as a direct and proximate result of the above noted substantial assistance provided by Allergan to Loren Z. Clayman and/or Clayman PA, Ms. Huck has spent monies in the amount of $3,750 or more, for medical and/or surgical care by Loren Z. Clayman and/or Clayman PA that was of no value, and which has caused her to have to incur future medical expenses in the future to correct the damages done by said medical and/or surgical care.

WHEREFORE, the Plaintiff **COLLEEN HUCK**, demands judgment for damages against the Defendants, **ALLERGAN, INC., ALLERGAN SALES, LLC,** and **ALLERGAN USA, INC.,** together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

## COUNT VII – ALLERGAN'S STRICT LIABILITY FOR DEFECTIVE PRODUCTS

102.    Ms. Huck re-alleges and incorporates by reference paragraphs 1 through 65.

103.    Allergan designed, researched, manufactured, assembled, tested, packaged, promoted, advertised, marketed, sold, distributed, or otherwise placed into the stream of commerce, the following saline filled breast implants:  right and left Natrelle Style 68 High Profile saline filled breast implants with unknown serial numbers that were implanted into Ms. Huck in March 2010, and explanted from Ms. Huck in August 2010; right and left Natrelle Style 68 High Profile 280 cc saline filled breast implants with serial numbers 15161413 and 16168995, respectively, that were implanted into Ms. Huck in August 2010 and explanted from Ms. Huck in May 2011; right and left Natrelle Style 68 High Profile 280 cc saline filled breast implant with

lot numbers 1855185 and 2028552, respectively, that were implanted into Ms. Huck in May 2011 and explanted from Ms. Huck on November 29, 2016.

104.    At all times material, Allergan expected the aforesaid saline filled breast implants to reach, and either or both did in fact reach, consumers in the State of Florida, including Ms. Huck, without substantial changes in the condition in which they were sold or distributed.

105.    At all times material, one or more of the aforesaid saline filled breast implants were being used in the manner intended, or based upon all of the circumstances reasonably expected, by Allergan.

106.    At all times material, one or more of the aforesaid saline filled breast implants were in fact defective and in an unreasonably dangerous condition at the time they were placed into the stream of commerce, and when put to their reasonably anticipated use, in one or more of the following ways:

    a.    <u>Design</u>

        (1).    One or more of the aforesaid saline filled breast implants was designed such that the valves permitted liquids from inside a patient's body cavity to travel inside the implant shells and spread infectious agents; or

        (2).    One or more of the aforesaid saline filled breast implants was designed such that the valves allowed saline fluid to escape from the implant shells, causing the need for subsequent surgeries to replace the implants; and

        (3).    Prior to the time that the implants identified above were sold, distributed, and/or placed into the stream of commerce, a safer alternative

design for the aforesaid saline filled breast implants existed and was commercially feasible; and

(4).    The design of the aforesaid saline filled implants was unreasonably dangerous when compared to the benefits they offered to patients who had them.

b.    <u>Manufacture</u>

One or more of the aforesaid saline filled breast implants was defectively manufactured such that

(1).    the valves permitted liquids from inside a patient's body cavity to travel inside the implant shells and spread infectious agents; or

(2).    the valves allowed saline fluid to escape from the implant shells causing the need for subsequent surgeries to replace the implants.

c.    <u>Warning</u>

(1).    One or more of the aforesaid saline filled breast implants contained an inadequate warning of the risks of their valves permitting liquids from inside a patient's body cavity to travel inside the implant shells and spread infectious agents; or

(2).    One or more of the aforesaid saline filled breast implants contained inadequate warning of the risks of their valves allowing saline fluid to escape from the implant shells causing the need for subsequent surgeries to replace the implants.

107.    The defective condition of one or both of the aforesaid saline filled breast implants subjected patients receiving the breast implants to infection or rupture/deflation, which

exceeded the benefits of the products, and for which safer products were available. This defective condition made one or both pairs of the aforesaid saline filled breast implants unreasonably dangerous when put to use as intended or reasonably expected by Allergan.

108.    The defective condition of one or both of the aforesaid saline filled breast implants directly caused or contributed to cause Ms. Colleen Huck to suffer bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

WHEREFORE, the Plaintiff, **COLLEEN HUCK**, demands judgment for damages against the Defendants, **ALLERGAN, INC., ALLERGAN SALES, LLC,** and **ALLERGAN USA, INC.,** together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

## COUNT VIII – ALLERGAN'S PRODUCT NEGLIGENCE

109.    Ms. Huck re-alleges and incorporates by reference paragraphs 1 through 65.

110.    Allergan was and is the entity that designed, researched, manufactured, assembled, tested, packaged, promoted, advertised, marketed, sold, distributed, or otherwise placed into the stream of commerce, the following saline filled breast implants: right and left Natrelle Style 68 High Profile saline filled breast implants with unknown serial numbers that were implanted into Ms. Huck in March 2010, and explanted from Ms. Huck in August 2010; right and left Natrelle Style 68 High Profile 280 cc saline filled breast implants with serial numbers 15161413 and 16168995, respectively, that were implanted into Ms. Huck in August 2010 and explanted from Ms. Huck in May 2011; right and left Natrelle Style 68 High Profile

280 cc saline filled breast implant with lot numbers 1855185 and 2028552, respectively, that were implanted into Ms. Huck in May 2011 and explanted from Ms. Huck on November 29, 2016. Accordingly, at all times material Allergan owed one of more of the following duties to the patients who received the implants in surgeries:

> (a).    to properly design, assemble, and manufacture the aforesaid Natrelle saline filled breast implants so that none of them created an unreasonable risk of harm, bodily injury, or death to their users or consumers;

> (b).    to provide labels and packaging materials that adequately warned implanting surgeons and the using public of the risks and dangers associated with the aforesaid Allergan Natrelle saline filled breast implants, including but not limited to the risk of their valves permitted liquids from inside a patient's body cavity to travel inside the implant shells and spread infectious agents, as well as the risk of the valves allowing saline fluid to escape from the implant shells, causing the need for subsequent surgeries to replace the implants; and/or

> (c).    to conduct adequate testing on the aforesaid Natrelle saline filled implants before releasing them into the stream of commerce to ensure that they were reasonably safe for their intended use.

111.    On or before February 2010 Allergan knew or should have known that the aforesaid Natrelle saline filled breast implants posed an unreasonable risk of harm, bodily injury, or death to its users, the patients who had them implanted into them.

112.    Allergan breached the duties it owed to its users, the patients who had Natrelle saline filled breast implants implanted into them, in one or more of the following ways:

> a.    <u>Design</u>

(1).    One or more of the aforesaid saline filled breast implants was designed such that the valves permitted liquids from inside a patient's body cavity to travel inside the implant shells and spread infectious agents; or

(2).    One or more of the aforesaid saline filled breast implants was designed such that the valves allowed saline fluid to escape from the implant shells, causing the need for subsequent surgeries to replace the implants; and

(3).    Prior to the time that the implants identified above were sold, distributed and/or placed into the stream of commerce, a safer alternative design for the aforesaid saline filled breast implants existed and was commercially feasible; and

(4).    The design of the aforesaid saline filled implants was unreasonably dangerous when compared to the benefits they offered to patients who had them.

b.    <u>Manufacture</u>

One or both of the aforesaid saline filled breast implants was defectively manufactured such that

(1).    One or more of the aforesaid saline filled breast implants was manufactured such that the valves permitted liquids from inside a patient's body cavity to travel inside the implant shells and spread infectious agents; or

(2).    One or more of the aforesaid saline filled breast implants was manufactured such that the valves allowed saline fluid to escape from the implant shells causing the need for subsequent surgeries to replace the implants.

    c.    <u>Warning</u>

    (1).    One or more of the aforesaid saline filled breast implants contained an inadequate warning of the risks of their valves permitting liquids from inside a patient's body cavity to travel inside the implant shells and spread infectious agents; or

    (2).    One or more of the aforesaid saline filled breast implants contained inadequate warning of the risks of their valves allowing saline fluid to escape from the implant shells causing the need for subsequent surgeries to replace the implants.

113.    Allergan's breach of the duty or duties it owed to users of Natrelle saline filled breast implants, including Ms. Huck, directly caused or contributed to cause Ms. Huck to suffer bodily injury and resulting pain and suffering, mental anguish, disability, disfigurement, and loss of the capacity for the enjoyment of life, has incurred and will incur in the future expense of hospitalization, medical and nursing care and treatment, and aggravation of a previously existing condition. These losses are permanent or continuing in nature, and she will suffer them in the future.

WHEREFORE, the Plaintiff **COLLEEN HUCK** demands judgment for damages against the Defendants, **ALLERGAN, INC., ALLERGAN SALES, LLC,** and **ALLERGAN USA, INC.,** together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

## COUNT IX – CONSORTIUM CLAIM

114.    Mr. Huck re-alleges and incorporates by reference paragraphs 1 through 113.

115.    Mr. Huck was and is the lawful wedded husband of Ms. Huck, and did and does reside with her.

116.    As a direct and proximate result of the above described wrongful conduct of the Clayman Defendants and Allergan, Mr. Huck has lost the care, comfort, and companionship of Ms. Huck, and he will suffer these losses in the future.

WHEREFORE, the Plaintiff **ETHAN G. HUCK** demands judgment for damages against the Defendants, **LOREN Z. CLAYMAN, M.D.**, **LOREN Z. CLAYMAN, M.D., P.A.**, **ALLERGAN, INC., ALLERGAN SALES, LLC,** and **ALLERGAN USA, INC.,** together with the costs of this action, and the Plaintiff respectfully demands a trial by jury on all issues so triable.

## CERTIFICATE OF REASONABLE INVESTIGATION

The undersigned counsel hereby certifies that he has made a reasonable investigation as permitted by the circumstances which have given rise to a good faith belief that grounds exist for the bringing of this action.

/s/ Christopher Shakib
**Christopher Shakib, Esquire**
**TERRELL HOGAN & YEGELWEL, P.A.**
233 East Bay Street, 8th Floor
Jacksonville, Florida  32202
Telephone:     (904) 632-2424
Facsimile:     (904) 632-5049
Primary Email: shakib@terrellhogan.com
Secondary Email: aashley@terrellhogan.com
Florida Bar No.: 0947865
Attorney for the Plaintiffs

/s/ Leslie A. Goller
**Leslie A. Goller, Esquire**
**TERRELL HOGAN & YEGELWEL, P.A.**
233 East Bay Street, 8th Floor
Jacksonville, Florida  32202
Telephone:     (904) 632-2424
Facsimile:     (904) 632-5049

Primary Email: lgoller@terrellhogan.com
Secondary Email: lkipp@terrellhogan.com
Florida Bar No.: 0393932
Attorney for the Plaintiffs